# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MARLIN GROSKREUTZ,**
          **Plaintiff,**

    **v.**                                 **Case No. 15-C-510**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
          **Defendant.**

## DECISION AND ORDER

Plaintiff Marlin Groskreutz applied for social security disability benefits, claiming that he could not work due to a variety of physical and mental impairments, but the Administrative Law Judge ("ALJ") assigned to the case concluded that none of those impairments significantly limited plaintiff's ability to work and thus denied the application. The Appeals Council declined review, making the ALJ's decision the final word from the agency on plaintiff's application. See Engstrand v. Colvin, 788 F.3d 655, 660 (7th Cir. 2015). Plaintiff now seeks judicial review of the ALJ's decision.

The court will uphold an ALJ's decision if he applied the correct legal standards and supported his decision with substantial evidence. Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Under this deferential standard, the court will not re-weigh the evidence or substitute its judgment for the ALJ's. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). Further, while the ALJ must build a logical bridge from the evidence to his conclusion, he need not provide a complete

written evaluation of every piece of testimony and evidence.  Id.  Ultimately, the court will affirm if the ALJ's opinion assures the court that he considered the important evidence, and the opinion enables the court to trace the path of the ALJ's reasoning.  Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985).  Because the ALJ satisfied these obligations in the present case, I affirm.

## I.  FACTS AND BACKGROUND

### A.    Overview

Plaintiff alleged disability due to anxiety, pelvic pain, and urinary dysfunction, with an onset date of December 31, 2010.  He indicated that he was essentially bed-ridden from December 31, 2010, to October 1, 2011, when he began to notice improvement based on the efforts of alternative treatment providers.

The medical records document urinary and prostate problems in the years prior to the alleged disability onset, for which plaintiff received treatment from two urologists, Dr. Matthew Anderson and Dr. Robert O'Connor, as well as his primary physician, Dr. Thomas Willett.  Dr. Willett also prescribed medications for anxiety and depression.  Following the alleged onset date, plaintiff received treatment primarily from an acupuncturist, chiropractor, and massage therapists.[1]  After plaintiff filed his application, the agency arranged for physical and mental examinations and obtained reports from several non-examining consultants.  Plaintiff presented no report from an "acceptable medical source" in support of his application.  See 20 C.F.R. § 404.1513(a).  Below I summarize the treatment records collected by the agency, the administrative proceedings on plaintiff's application, and the ALJ's decision.

_____

[1]Dr. Willett continued to prescribe plaintiff's medications.

2

## B. Treatment Records

On September 26, 2008, plaintiff saw Dr. Willett for poison ivy. Plaintiff was at the time taking Flomax for chronic prostatitis and prostate hypertrophy, Alprazolam for anxiety, and Paxil for depression. Dr. Willett gave plaintiff a shot of Depo-Medrol and instructed him to use Caladryl for itching. Plaintiff also noted vitiligo of the hands, starting on the face, for which he was going to try Cortaid.[2] (Tr. at 278.)

On March 6, 2009, plaintiff saw Dr. Anderson on an urgent basis regarding difficulty urinating. He reported inability to urinate over the past week, doing intermittent catheterization. He had known BPH with significant bladder outlet obstruction,[3] undergoing a transurethral incision of the prostate about 18 months previously. Dr. Anderson recommended photo-selective vaporization of the prostate.[4] (Tr. at 290.)

On June 5, 2009, plaintiff saw Dr. Willett for an annual physical exam. His main complaint was trouble urinating, to the point where he had to catheterize himself. He had been on antibiotics for chronic prostatitis but still had more trouble. He also had neurofibromatosis affecting his face and back.[5] He previously had vitiligo of his hands, which seemed to be better. He also had anxiety and depression associated with his problems with urination. Dr.

---

[2]Vitiligo is the appearance on otherwise normal skin of non-pigmented white patches. Stedman's Medical Dictionary 1976 (27th ed. 2000).

[3]Benign prostatic hyperplasia ("BPH") is an enlarged prostate gland. http://www.webmd.com/men/prostate-enlargement-bph/benign-prostatic-hyperplasia-bph-to pic-overview.

[4]Photo-selective vaporization of the prostate ("PVP") is a treatment for BPH. http://www.mayoclinic.org/tests-procedures/laser-pvp-surgery/basics/definition/prc-20013394/

[5]Neurofibromatosis is a genetic disorder that causes tumors to form on nerve tissue. http://www.mayoclinic.org/diseases-conditions/neurofibromatosis/home/ovc-20167893.

3

Willett provided Darvocet for pain associated with catheterization and samples of Cialis to see if it helped with urination. (Tr. at 276.)

On June 22, 2009, Dr. Anderson performed a flexible cystoscopy,[6] which was suggestive of probable bladder outlet obstruction. Dr. Anderson recommended laser vaporization of the prostate to alleviate bladder outlet obstruction. (Tr. at 293.)

On July 21, 2009, Dr. Anderson performed a cystoscopy with photo-selective vaporization of the prostate. (Tr. at 269, 298.) Plaintiff returned for follow up on August 10, urinating well but with moderate to weak force of stream. His hesitancy was markedly improved. Dr. Anderson noted an excellent result from the PVP procedure with no serious complications. (Tr. at 301.)

On June 7, 2010, plaintiff saw Dr. O'Connor on referral from Dr. Anderson complaining of incomplete bladder emptying and urinary hesitancy. Dr. O'Connor recommended a flex cystoscopy. (Tr. at 310.) Plaintiff also complained of pelvic floor discomfort. (Tr. at 311.) Dr. O'Connor performed the cystoscopy on July 8, 2010. (Tr. at 313.) Dr. O'Connor recommended an InterStim trial,[7] but plaintiff wanted to continue with his home physical therapy. If the therapy did not work, he would consider InterStim. (Tr. at 314.)

On August 4, 2010, plaintiff saw Lindi Magnuson, PT, on referral from Dr. O'Connor, for pelvic muscle rehabilitation. (Tr. at 340.) She planned to see him for several months for

---

[6]A cystoscopy is a test that allows the doctor to look at the inside of the patient's bladder and urethra using a thin, lighted tube called a cystoscope. http://www.webmd.com/a-to-z-guides/cystoscopy-16692.

[7]InterStim therapy involves the placement of a device under the skin in the hip area, which sends impulses to stimulate the nerves that suppress bladder contraction. http://mayoclinichealthsystem.org/locations/eau-claire/medical-services/urology/interstim-therapy.

4

neuromuscular reeducation, soft tissue mobilization, progressive therapeutic exercise, joint mobilization as needed for pelvic alignment issues, electrical stimulation as needed for pelvic floor strengthening, and education in long-term symptom management. (Tr. at 343.) According to a December 28, 2010, discharge letter, plaintiff was seen six times between August 4, 2010, and September 28, 2010, with four cancellations since his last visit in September. His objective findings were consistent with pelvic floor muscle dysfunction. He lived quite a distance from the clinic and attendance had been an issue. She provided him with clear instructions for self-management and home exercise. However, he continued to follow his own self-prescribed management program, not that of the physical therapist. Plaintiff agreed that continuation of PT would not be productive and was best discontinued. (Tr. at 336.)[8]

In January 2011, plaintiff started seeing an acupuncturist, Barbara Bittinger, for his pelvic tension and urination problem. (Tr. at 356.) The notes generally indicate that plaintiff felt somewhat better after treatment sessions, and that progress was being made. (Tr. at 361-69.) During a January 20, 2011 session, Bittinger noted: "Displaying ocd behavior, Trying to dictate tx, Very anxious; fidgeting, expressing tension." (Tr. at 364.) On March 22, 2011, plaintiff reported urinating on his own (Tr. at 370), but on April 15, 2011, he reported having to use a catheter again and that he had backed off walking for exercise due to pain in his right groin area (Tr. at 371). On April 27 and 29, 2011, he reported soreness that he associated with

_____

[8]According to the notes, on August 17, 2010, plaintiff was found to be responding well to PT intervention, compliant with a home exercise program. (Tr. at 339.) On August 26, 2010, his proprioceptive awareness was improving slowly, but he continued to have difficulty comprehending pelvic muscle exercises despite multiple cues and strategies. (Tr. at 338.) On September 28, 2010, his tolerance to sitting and bladder filling was improving. The therapist encouraged him to consider returning to work part-time in the near future, but noted that he may need professional counseling on stress management if he returned to work. (Tr. at 328.) Plaintiff cancelled later appointments. (Tr. at 323-26.)

getting better. Bittinger further noted that he seemed obsessive, concerned about everything being done exactly the same way. (Tr. at 373-74.) In May 2011, plaintiff reported feeling more relaxed and less anxious (Tr. at 376) but in the summer of 2011 he reported continued groin pain (Tr. at 377-80). On September 6, 2011, Bittinger noted that plaintiff appeared to be walking normally, in good spirits, with no significant tension in the neck and back. (Tr. at 381.) On November 1, 2011, he reported voiding on his own and appeared happy and talkative. (Tr. at 383.) On December 6, 2011, Bittinger noted much progress with anxiety; plaintiff had returned to church and activities but could not sit too long. (Tr. at 385.)[9]

Between February 9 and April 18, 2011, plaintiff saw Ethan Hagen, D.C., for 10 chiropractic treatment sessions. Plaintiff complained of muscle spasm and pain in the area of the pudendal nerve, which radiated through his pelvis bilaterally. He also reported severe difficulty urinating. Secondary complaints included thoracic spine stiffness and pain and tenderness in the cervical spine. Initial examination revealed a marked left pelvic rotation relative to the thoraces both standing and prone. He also demonstrated a ½ inch left leg length deficiency prone. He suffered with neurofibroma disease, and it was thought that this may play a significant role in some of his neurologic complaints. All other orthopedic and neurologic testing was negative. Dr. Hagen provided adjustments to reduce the left rotation of the pelvis. (Tr. at 351.)

Between June 15, 2011, and December 31, 2011, plaintiff saw a massage therapist, Janice Huth-Engel, for his complaints of pain in the pelvic and groin area and inability to urinate without catheterization. Huth-Engel noted that plaintiff exhibited a high level of anxiety that

---

[9]The record also contains notes from an acupuncturist plaintiff saw in 2007 and 2010. (Tr. at 387-402.)

could go into depression, but he was not aware of it. She observed that his anxiety manifested in extreme hyper-tonicity throughout his body, not just in his pelvic and lumbar area. His sessions consisted of soft tissue therapy, including myofascial release therapy, deep tissue and cranial sacral therapy to help relieve tension, and structural work to release tightness in tissue. His sessions also included some recommendations of self-help techniques that he could incorporate at home, i.e., stretching, breathing, and meditating. She noted that plaintiff responded well to therapy and experienced some relief. His anxiety appeared to lessen, and he was more relaxed as the sessions progressed. (Tr. at 406, 503.)

On June 20, 2012, plaintiff saw Dr. Willett for prescription renewal, reporting no new problems. The note lists diagnoses of chronic prostatitis, vitiligo, neurofibromatosis, BPH, and anxiety/depression. (Tr. at 551.)

On August 24, 2012, Bittinger, the acupuncturist, wrote a letter indicating that plaintiff had been coming in for treatment more frequently in the past few months. This was on his own volition trying to get through his healing process quicker. He reported occasionally trying to get back to routine daily activities such as taking drives, going for a walk, or going to church, but that he usually had an exacerbation of his symptoms after. (Tr. at 429; see also Tr. at 430- 71, Bittinger's 2012 treatment notes.) By July 2012, plaintiff reported feeling more relaxed, and that his nervous system was "letting go more." (Tr. at 465.)

Between September 10, 2012, to September 24, 2013, plaintiff returned to Huth-Engel. She reported that plaintiff was still having issues with pulling and tightness from his sacrum up to his head. She continued to use cranio-sacral therapy to release the tension. She was able to release the tension focusing on his thoracic, neck, cranial bones, zygoma, and pterygold muscles. She realized that his pterygold muscles were extremely hyper-tonic and were stuck

7

in a pattern that would not release easily. This created extreme tension in his mouth, which referred throughout his entire body. They had spent the last two months with that focus and continued to show increased progress. His stress level had decreased, and she continued to recommend relaxation techniques to help him at home. (Tr. at 504.)

On March 18, 2013, Bittinger wrote that plaintiff was being seen two to three times per week for ongoing complaints of general muscle tension, pain and discomfort in the perineum, choking episodes and nervousness. He had made progress in not having to use a catheter for months, but he did still complain of waking frequently every night because of bladder tension and discomfort alleviated by short voidings of urine. Plaintiff still complained of not being able to go for car rides of any long duration, sitting in one position for long, and needing to lie down frequently during the day, which kept him from activities of daily living. In general, he maintained a positive attitude about improving his condition and complied with advice, but progress was slow. (Tr. at 486; see also Tr. at 532-48, notes from Bittinger dated 3/8/13 to 5/15/14.)

On April 8, 2013, Vicki Walther, a massage therapist, provided a synopsis of the treatment she had provided since April 12, 2011. (Tr. at 498.) When plaintiff first presented he identified severe anxiety and depression, groin pain, and difficulty urinating. His behavior was consistent with someone with mental health issues; he presented as very nervous, easily distracted, and having a short attention span. The initial assessment determined that he showed signs and symptoms consistent with piriformis syndrome and weakness in the bilateral piriformis muscles. Palpations determined that his bilateral anterior hip flexors, gluteus muscles, and adductor muscles were hyper tonic. The aim of the initial treatment was to reduce these muscular imbalances, compensatory patterns, and myofascial restrictions. In

8

November 2011, a shift in focus occurred; pressure was increased to include deep tissue and trigger point therapy as needed. Primary focus also shifted from localized treatment of musculature of the hips and abdomen to the muscular system and soft tissue in general. Plaintiff initiated a change in activities of daily living, increasing the amount of walking in the spring of 2012. Treatment then focused on re-balancing muscle groups. Walther directed plaintiff to use less force when stretching for self care in the winter of 2013. He had since been compliant with self-care and moderating the degree of stretch to lengthen his muscles. Plaintiff continued to show improvements and changes in signs and symptoms over the course of treatment and in response in activities of daily living. (Tr. at 499; see also Tr. at 500-02, treatment notes.)

On July 1, 2013, Thomas Charron, a licensed massage therapist, provided a letter indicating that he was not permitted to diagnose any medical condition or disease. Charron indicated that plaintiff first presented on March 12, 2013, with a primary complaint of abdominal pain as well as leg pain in the quadriceps and adductor muscles. In subsequent visits, he complained of pain in and around the groin and perineal areas. Plaintiff reported a variety of symptoms, mostly pain in the urogenital area, as well as difficulty urinating, for several years. Charron noted that plaintiff's symptoms and responses to treatment varied. He often felt periods of relaxation post-session but that was usually tied to an increase in pain symptoms in the perineal area and inner thighs, generally worse on the right. From a therapeutic point of view, plaintiff carried tension in the region deep to the sacral area fairly consistently. In the most recent treatment session, they made significant headway in that area. Plaintiff also showed a tendency towards coccygeal tension, as well as tension in the abdominal area. (Tr. at 489.) He further showed a tendency towards a right-side bending of the head with soft

9

tissue tension of the neck and flexion of the spine in general due to some extent to poor postural habits and de-conditioning, but also due to some anteriorly related tensions in the thorax and abdomen. Over the course of his treatments, Charron noted improvement in plaintiff's ability to extend his spine, and his neck had taken a more neutral position while seated and standing. Charron had also seen a shift in points of tension from the original sessions, which was indicative of a body that had undergone a compensatory shift, consistent with the positive effects of the treatment Charron provided. However, plaintiff's main complaint of perineal pain still existed, as did the propensity for his symptoms to increase during periods of relaxation. (Tr. at 490; see also Tr. at 491-96, treatment notes.)

According to a September 4, 2013, note from Dr. Willett, plaintiff was seen for prescription renewal and an annual checkup. The note indicated his anxiety was improved and listed diagnoses of anxiety, vitiligo, and chronic prostatitis. (Tr. at 550.)

On May 19, 2014, Charron indicated that plaintiff's response to treatment remained similar to what was described in the previous correspondence, that being a period of relaxation often accompanied by pain. Plaintiff's discomfort was mostly in the medial aspects of his legs, particularly on his right side, and did not include the rectal or perineal areas as much as in earlier sessions, though the area was still problematic on occasion. Plaintiff showed some postural improvement in the seated position with a lessening in the degree of side bending of the head to the right side. He continued to seek treatment from several practitioners as well as utilizing an inversion table and sacro-wedgy for home care. (Tr. at 518; see also Tr. at 519-31, treatment notes.)

**C.      Administrative Proceedings**

**1.      Plaintiff's Application and Supporting Materials**

On January 17, 2012, plaintiff applied for disability insurance benefits, alleging an onset date of December 31, 2010.  (Tr. at 201.)  In his disability report, plaintiff indicated that he could not work due to severe anxiety, pelvic pain, nerve and muscle pain, depression, difficulty urinating, neurofibromatosis, vitiligo, and piriformis syndrome.  (Tr. at 217.)  Plaintiff reported that he worked as an industrial engineer from 1978 to October 2008.  (Tr. at 218.)  He stopped working on October 15, 2008, because of his conditions and other reasons.  He indicated that his company downsized due to the economy, laying off a number of people; he believed he was one of them because he was missing a lot of work due to his conditions.  (Tr. at 217.)  Plaintiff reported taking Alprazolam for anxiety and insomnia, Paroxetine for anxiety, and Tramadol for pain, prescribed by Dr. Willett.  (Tr. at 220.)  He indicated that his problems started back in 1996, when he started having pelvic pain and difficulty urinating, which led to anxiety, muscle tension, and trouble sleeping.  He started on anti-anxiety medications.  From 1998 to 2007, he missed work at times.  Since 2007, his condition had gotten progressively worse; after December 2010, it laid him up completely 90% of the time.  He reported seeing various specialists, including urologists, neurologists, and physical therapists, who performed various tests but could not find a cause for his problems.  He did note some improvement since pursuing alternative medicine treatments – acupuncture, cranial sacral and neuromuscular massage.  (Tr. at 232.)

In a function report, plaintiff reported pain with sitting, which increased his anxiety. When his anxiety was bad, he had a hard time driving, sleeping, and concentrating.  This in

11

turn affected his nervous system and created tension in his muscles. He reported being dependent on drugs to get through the day and sleep at night. From December 31, 2010, to October 1, 2011, he spent 90% of his time in bed. Through alternative therapies, he had regained the ability to move about; he still had the same problems but with decreased severity. (Tr. at 233.) He reported no problem with personal care. (Tr. at 234.) From December 31, 2010, to October 1, 2011, he was unable to prepare meals or do any household chores; he was now able to cook quick meals and had eased back into chores. He lived with his father, who did the chores plaintiff could not. (Tr. at 235.) Plaintiff reported being able to drive but traffic increased his anxiety. He shopped once per week for 15-20 minutes. (Tr. at 236.) He reported hobbies of hunting, fishing, playing cards, and watching TV, but he had stopped all except TV. He reported attending church regularly before December 31, 2010; since October 1, 2011, he was slowly returning to attendance. (Tr. at 237.) He indicated that he could walk one mile, pay attention for ½ hour but not at full capacity, finish what he started, and follow instructions pretty well. (Tr. at 238.)

**2.    Agency Review**

The agency arranged for mental and physical examinations. Following those exams, the agency obtained reports from non-examining consultants.

**a.    Psychological Evaluation**

On March 27, 2012, Scott Trippe, Psy.D., completed a psychological evaluation for the agency. When asked why he could not work, plaintiff responded that he had high anxiety and a lot of pain. He indicated he could not think clearly and had a hard time driving. Plaintiff reported receiving a bachelor's degree in business in 1978 and an associate's degree in

12

computer science in 1986.  He worked for Buckstaff Industries from 1978 to 2008 as an industrial engineer, the last 20 years in a management position.  (Tr. at 407.)

Plaintiff provided a detailed chronological list of his medical problems.  He was diagnosed with prostatitis in 1996, which caused aching in his joints and muscles in his urethra.  In 1997, he had an ultrasound of his kidneys, which was normal.  In 1998, he went to the emergency room to have his bladder drained.  He has a cystoscopy and an ultrasound of the prostate later that year.  In 1999, he had a biopsy of his prostate and bladder, which showed inflammation.  In 2000, a liver panel test was normal.  In 2003, he suffered another attack of bladder pain.  In 2007, life stressors caused an increase in pain and difficulty urinating, and he received a transurethral incision of the bladder neck ("TUIBN"), a method of relieving bladder outflow obstruction,[10] which resolved his problems for a few months.  He reported that he ultimately lost his job due to his illnesses.  In 2009, his doctor did a cystoscopy and recommend a transurethral resection of the prostate ("TURP").[11]  In 2010, he tried an indwelling catheter for one week, and he received acupuncture treatment for three months.  He also received pelvic floor physical therapy and biofeedback in 2010, which he reported increased his pain and difficulty urinating.  In January 2011, he reported experiencing a lot of pain, anxiety, and tension, spending 90% of the day in bed.  He began seeing an acupuncturist at that time.  In February 2011, he started seeing a chiropractor, in May 2011 a neuromuscular massage therapist, and in June 2011 a cranio-sacral therapist.  He currently reported a decrease in symptoms as a result of these treatments.  He stated that from the beginning of 2011 to about

---

[10]http://www.ncbi.nlm.nih.gov/pubmed/7538396.

[11]http://www.nlm.nih.gov/medlineplus/ency/article/002996.htm.

13

October 2011, he was lying down about 90% of the time; with treatment, he felt they were in the "process of unwinding a knot." (Tr. at 408.) He reported taking medications for his enlarged prostate, anxiety, and pain. (Tr. at 408.)

On mental status exam, plaintiff was oriented for time, place, and person, and his thought processes were logical and coherent. He was able to sit without apparent pain during the hour-long interview, his gait appeared normal, and he did not require assistive devices to ambulate. (Tr. at 408.) He was cooperative during the interview, with no signs of malingering or factitious behavior. Plaintiff described his mood as "not good," indicating that he contemplated cancelling the evaluation because he was not sure he could drive. However, he did not display any significant non-verbal signs of depression or anxiety during the interview, and Dr. Trippe noted no psychomotor agitation or retardation. Plaintiff reported being able to sleep with his medication but rated his appetite as terrible and his energy level as not good. He did not display or express delusions, hallucinations, psychotic thought processes, or homicidal ideation. He denied recent suicidal ideation. He indicated that he did tend to worry about and over-focus on his health. Regarding memory functioning, he was able to recall recent and remote personal history with no apparent difficulty but reported that he was not as sharp as he was before that 10-month period. He was able to recall three words immediately after hearing them and all of those words after a five-minute delay. He was also able to recall five digits forward and four digits backwards, representing above-average short-term recall. He further displayed a good fund of working knowledge and good basic math calculation skills. He displayed no significant difficulty maintaining his focus during the hour-long interview. He also displayed the use of abstract thought processes during the interview. (Tr. at 409.) He displayed partial insight into his current condition, and his judgment appeared intact in most

14

areas.  (Tr. at 409-10.)

Regarding activities of daily living, plaintiff reported that he could do his own cooking, cleaning, and shopping, as well as drive a car.  He also reported volunteering at his church, walking in the gym five days per week (two 45-minute walks per day), attending therapy appointments, and selling stuff on eBay.  Socially, he mostly talked on the phone with friends, occasionally going out to eat.  (Tr. at 410.)

Dr. Trippe concluded that plaintiff met the diagnostic criteria for an adjustment disorder with anxiety based on his history and presentation of the following symptoms: anxiety, difficulty controlling worrying about his physical health, feeling restless, experiencing muscle tension, periods of irritability, being easily fatigued, and sleep disturbance, as a result of chronic prostate dysfunction and pain.  Dr. Trippe assigned a GAF score of 58 to 63, denoting mild to moderate impairment in psychological and emotional functioning.[12]  (Tr. at 410.)

In a statement of work capacity, Dr. Trippe found no to mild impairment in plaintiff's ability to understand, remember, and carry out simple instructions; mild impairment in his ability to adapt to change; no to mild impairment in his ability to concentrate and focus; no to mild impairment in his ability to work with peers; mild to moderate impairment in his ability to maintain a regular schedule of activities; and moderate impairment in his ability to tolerate stress at work.  (Tr. at 411.)

_____

[12]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others.  Scores of 61-70 reflect "mild" symptoms and 51-60 "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

15

### b.    Physical Evaluation

On April 22, 2012, A. Neil Johnson, M.D., performed a medical evaluation for the agency. Plaintiff reported chief complaints of neurofibromatosis, muscle pain, pelvic pain, difficulty urinating, and anxiety. He indicated that he was diagnosed with neurofibromatosis 30 years ago, and that he had about five neurofibromas removed from his back, buttock, nose, and right forearm. He noted that lying on a neurofibroma could be uncomfortable. From 1996 to 2010, he saw ten different specialists, who could not figure out what was causing his problems with muscle pain, pelvic pain, and difficulty urinating. He felt that he was getting very anxious, which gave rise to physical symptoms. He sought alternative treatments, including acupuncture, which had been helpful. (Tr. at 413.)

Plaintiff reported that he could walk about 10 minutes or about 10 laps of a basketball court. He could only sit or stand a minute, as it was uncomfortable. He spent most of his time lying down, spending about 90% of the time in bed. He also described a severe anxiety problem. He had also developed a significant problem with urinating. He underwent a TURP procedure in 2009. He did self cath most of the time; only occasionally did he urinate on his own. He also reported that his back bothered him; he believed it was the muscles but stated he could lift 70 to 80 pounds. He could get up a flight of stairs. He did a little snow shoveling this past year and had cut the lawn in the past. He stated his main problems were severe anxiety, myalgias, and difficulty urinating. (Tr. at 413.)

Dr. Johnson noted that plaintiff was pleasant and cooperative but did seem anxious. He had multiple neurofibromas all over the body. He walked normally without an assistive device. He had no difficulty getting on and off the exam table, tandem walking, squatting, or hopping. He displayed normal range of motion and full use of the hands. (Tr. at 414.) Dr.

Johnson assessed severe anxiety disorder, which perhaps affected plaintiff's physical symptoms, particularly myalgias; neurofibromatosis, which did not bother plaintiff unless he lied wrong on one of the neurofibromas; and history of TURP, only occasionally urinating without a catheter.  (Tr. at 417.)

### c.    Non-examining Consultants

On May 1, 2012, agency medical consultant Mina Khorshidi, M.D., found no severe physical impairment.  (Tr. at 128.)  On May 1, 2012, agency psychological consultant Deborah Pape, Ph.D., found no restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.  (Tr.  at 129.)  Relying on these reports, the agency denied the application initially on May 2, 2012.  (Tr. at 122, 148.)

Plaintiff requested reconsideration, but on November 1, 2012, the agency again denied the claim.  (Tr. at 134, 153.)  This time, the agency relied on the assessments of consultants Syd Foster, D.O., who found no severe physical impairment (Tr. at 141), and Eric Edelman, Ph.D., who found mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation (Tr. at 141-42).

Plaintiff then requested a hearing (Tr. at 157), and on June 4, 2014, he appeared with counsel before ALJ Patrick Toal (Tr. at 41, 171).

### 3.    Hearing

### a.    Plaintiff's Testimony

At his hearing before the ALJ, plaintiff testified that he obtained a business degree with

17

a major in finance, as well as an associate's degree in computer science. (Tr. at 45.) He had a good work record prior to his alleged disability onset date of December 31, 2010; he had not worked since then. (Tr. at 46.) He had a driver's license but experienced nervousness driving on busy roads. (Tr. at 49-50.) He reported taking Paroxetine and Alprazolam, prescribed by his family physician, Dr. Willett, which helped to a certain extent, with sleep and relaxation. (Tr. at 50-51.) He had taken Alprazolam or Lorazapam since 2000 and Paroxetine since 2008, without side effects. (Tr. at 51.) He lived with his 95 year-old father. (Tr. at 52.)

Plaintiff reported dealing with anxiety, pain in the pelvic region, and urinary dysfunction for many years. He was able to control the symptoms fairly well until 2007, continuing to work. (Tr. at 53-54.) In 2008, he was laid off due to a company-wide downsizing and his health. (Tr. at 54-55.) He collected unemployment until 2010 (Tr. at 56), looking for other work in the industrial engineering field (Tr. at 57).

In 2010, plaintiff saw doctors who did urodynamic studies but found nothing. He then asked to see a physical therapist due to pain in the pelvic region. (Tr. at 59.)

Plaintiff testified that at the end of 2010, beginning of 2011, he "declared [himself] disabled." (Tr. at 60.) He indicated that is when his symptoms really nosedived. (Tr. at 61.) He indicated that for the first 10 months of 2011 he was basically bed-ridden. He testified that he was in such terrible pain that he laid in bed or on the couch. He did not cook or cut the lawn. (Tr. at 61.) The testing he received came up negative, and he started going to alternative therapy – acupuncture and massage. (Tr. at 61-62.) He testified that the alternative therapies made things worse in the beginning before it started helping him. (Tr. at 63, 65, 79.) He started to feel better in October 2011. (Tr. at 67.) He also saw a chiropractor in 2011, who stated that he had never seen a piriformis (a muscle in the pelvic region) as rock hard as

18

plaintiff's.  (Tr. at 67.)  During this period plaintiff also saw Huth-Engle, the cranial-sacral therapist.  (Tr. at 68.)  She said she had never seen anyone with muscles inside the mouth and head so locked up and so hard.  (Tr. at 69-70.)  These alternative methods helped him to the point where he could get out of bed and get off the couch.  (Tr. at 70.)  He saw his family doctor for general wellness, but no specialists.  (Tr. at 76.)

Plaintiff testified that following this 10-month period he was able to maintain his hygiene, clean his home, shop, and cook a simple meal.  (Tr. at 71-72.)  He did not use an assistive device to walk.  (Tr. at 76.)  He socialized little and did not do anything for an extended period of time because his body started to lock up, causing pain.  (Tr. at 77.)

Plaintiff testified that in his opinion the cause of his problem was that his body had been locked up, his muscles had been tight for many years.  (Tr. at 79.)  He took muscle relaxants but they did not help.  (Tr. at 80.)  Asked about mental health issues, plaintiff testified that he wanted to stay more on the physical.  (Tr. at 81.)  Plaintiff received medications but sought no other mental health treatment.  (Tr. at 91.)  None of his alternative providers recommended additional mental health treatment, and he did not seek out any such treatment.  (Tr. at 92.) Plaintiff believed that his physical problems caused the mental part.  (Tr. at 94.)

Despite the improvement he had received from alterative medicine, plaintiff testified that he did not think he could work because he still was not at the point where he could do anything for a consistent period of time, more than 30-45 minutes, before his muscles tensed up.  (Tr. at 87.)  After his muscles tensed up, he had to lay down for 15-20 minutes.  (Tr. at 99.)  The alternative treatment had improved his symptoms, but he was still restricted in what he was able to do so.  (Tr. at 89-90.)  He had noted a huge improvement since 2011.  (Tr. at 90.)  His anxiety had also lessened, although he still did not like to drive on busy roads for an extended

19

time.  (Tr. at 100.)  Based on his progression, he believed that there would be a point where he could go back to work, but he was not there yet.  (Tr. at 95.)

### b.    Medical Expert's Testimony

The ALJ summoned Larry Larrabee, a clinical psychologist, who listened to the testimony and reviewed the record.  (Tr. at 108.)  Dr. Larrabee offered a diagnosis of an adjustment disorder with anxiety, with mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild limitation in maintaining concentration, persistence, and pace.  (Tr. at 109-10.)  He based those opinions primarily on Dr. Trippe's examination report and plaintiff's function report.  He found no episodes of decompensation.  His testimony was limited to plaintiff's mental and emotional functioning, not any physical condition plaintiff had.  These ratings suggested no severe mental impairment under social security rules.  (Tr. at 110.)

Dr. Larrabee disagreed with Dr. Trippe's finding of mild to moderate impairment in the ability to maintain a regular schedule and moderate impairment in the ability to tolerate stress at work.  Dr. Larrabee rated those two areas as "none" and "mild."  Dr. Larrabee found no evidence in the record that would justify these two moderate ratings from Dr. Trippe and wondered if Dr. Trippe had started thinking more in terms of some of the physical issues plaintiff had that might interfere with work.  Dr. Larrabee did agree with the other ratings Dr. Trippe gave.  (Tr. at 111.)  Dr. Larrabee further noted that the only mental health treatment plaintiff received was medications from his primary doctor.  He further opined that plaintiff's mental symptoms were a reaction to his physical discomfort.  (Tr. at 112.)  He agreed with the ALJ that it was significant that Dr. Trippe did not include physical ailments under axis four in his report.  (Tr. at 113.)  However, Dr. Trippe did include a detailed medical history earlier in

20

his report.  (Tr. at 115-16.)

         **c.**      **Vocational Expert's Testimony**

The ALJ also summoned a vocational expert ("VE"), but the ALJ asked the VE no hypothetical questions regarding plaintiff's ability perform jobs.  (Tr. at 119.)  On questioning by plaintiff's counsel, the VE said that employers would not tolerate unscheduled breaks of five to ten minutes four to five times per day on a consistent basis.  (Tr. at 119.)  Nor would they tolerate three absences per month on a consistent basis.  (Tr. at 120.)

**D.**    **ALJ's Decision**

On June 25, 2014, the ALJ issued an unfavorable decision.  (Tr. at 21.)  The ALJ determined that plaintiff had not engaged in substantial gainful activity since December 31, 2010, the alleged onset date, and that he had the medically determinable impairments of adjustment disorder with anxiety, neurofibromatosis, and urinary dysfunction.  However, the ALJ found that plaintiff did not have an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities.  (Tr. at 26.)  In reaching this conclusion, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence.  (Tr. at 27.)

The ALJ first summarized plaintiff's claims.  Fifty-seven years old at the time of the hearing, plaintiff reported living with his 95 year-old father, who was in good health.  Plaintiff was college educated with a bachelor's degree in finance and an associate's degree in computer science.  He worked for 30 years, from 1978 to 2008, as an industrial manufacturing engineer for a contract wood manufacturer.  He alleged an inability to work due to his various physical and mental health complaints.  He claimed that these concerns affected his ability to

21

stand, walk, sit, remember, complete tasks, concentrate, understand, follow instructions, and handle stress and change. In his January 2012 function report, plaintiff maintained that between December 31, 2010, and October 1, 2011, he spent 90% of his time in bed. After October 1, 2011, he stated that he could walk one mile and pay attention for 30 minutes, though not at full capacity. At his April 2012 consultative examination, plaintiff reported being able to walk for about 10 minutes, stand for about one minute, and lift between 70 and 80 pounds. (Tr. at 27.)

The ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. at 27.) First, the medical records failed to fully substantiate plaintiff's allegations of disabling symptoms. Second, plaintiff's activities suggested that he possessed the abilities and aptitudes necessary to do most jobs. (Tr. at 28.)

Regarding the medical evidence, the treatment notes reflected complaints of urinary problems and pain in the abdominal/perineal area. Plaintiff also had a history of incomplete bladder emptying status post TUIB in November 2007 and photo selective vaporization of his prostate in July 2009. Plaintiff also endorsed diffuse muscle/joint tightness, stiffness, and soreness. He had also been diagnosed with BPH and acontractile bladder on urodynamics study. Treatment since 2009 had included medication, self-catheterization, pelvic floor physical therapy, and alternative health treatments including acupuncture and massage therapy. (Tr. at 28.)

However, physical exams revealed good physical function. Notes from April 2011 showed that plaintiff was exercising and from September 2011 that he was walking normally.

22

X-rays of his spine taken during his March 2012 consultative medical exam were normal. The consultative examiner, Dr. Johnson, noted that plaintiff walked normally without use of an assistive device. Plaintiff walked very easily across the room without difficulty and had no difficulty getting on and off the exam table, tandem walking, squatting, or hopping. He complained of discomfort on range of motion of the neck and back and tenderness to palpation, but his straight leg raises were negative, range of motion throughout was full, strength was 5/5, reflexes symmetrical, sensation intact, and use of his hands full. Similarly, the psychological consultant, Dr. Trippe, noted that plaintiff was able to sit without apparent pain during an hour-long interview and that plaintiff was able to walk with a normal gait without assistive devices. (Tr. at 28.)

Moreover, the treatment notes showed improvement in plaintiff's urinary dysfunction with interventions, as well as a history of non-compliance. Treating notes from July 2009 showed improvement following the laser PVP of his prostate and from July and September 2010 showed improvement with physical therapy. However, treating notes also showed that plaintiff was not fully compliant with physical therapy, cancelling appointments and following his own self-prescribed management program rather than that of the physical therapist. (Tr. at 28.)

Plaintiff also had a history of neurofibromatosis. However, this condition did not interfere with his ability to function, causing discomfort only when he lied on his neurofibromas in the wrong position. (Tr. at 28.)

Plaintiff also reported symptoms of anxiety and had been diagnosed with an adjustment disorder with anxiety. Treatment included medications such as Paroxetine and Alprazolam, in addition to alternative health treatments such as acupuncture and massage therapy. (Tr. at 28.) However, the medical records documented very good mental and social functioning.

23

Dr. Trippe found plaintiff cooperative, with logical and coherent thought processes and no abnormality in thought content. Dr. Trippe further noted that while plaintiff described his mood as not good he displayed no significant non-verbal signs of anxiety or depression. Dr. Trippe further reported that plaintiff displayed good memory, good fund of working knowledge, and good math skills. Plaintiff exhibited no significant difficulty maintaining focus and was able to use abstract thought processes. His insight into his condition was partial, but his judgment was intact. Dr. Johnson described plaintiff as anxious but pleasant, cooperative, and intelligent with clear speech. (Tr. at 29.)

In addition, treating notes reflected some improvement with medication therapy and alternative interventions. For instance, September 2013 notes indicated that plaintiff's anxiety had improved; massage therapy notes from 2011 showed that plaintiff responded well, with lessened anxiety; notes from 2012 and 2013 showed decreased stress levels; and June 2013 acupuncture notes indicated that plaintiff's anxiety was getting better and his energy was good. An April 2013 letter from one of the massage therapists indicated that plaintiff continued to show improvements with corresponding changes in signs, symptoms, and activities of daily living. (Tr. at 29.)

Because plaintiff had a medically determinable mental impairment, the ALJ considered the four broad functional areas set forth in the disability regulations. First, the ALJ found mild limitation in activities of daily living. In his function report, plaintiff alleged that between December 31, 2010, and October 1, 2011, he was essentially bed-ridden, and the medical records referenced a phone call from plaintiff's father in August 2011 indicating that plaintiff would not leave the house due to depression. However, this period lasted less than 12 months, and plaintiff admitted that after October 1, 2011, he was able to engage in a variety

24

of activities, including preparing simple meals, doing household chores, driving (although he did not like heavy traffic), shopping in stores and by computer, managing money, and attending church services. In March 2012, plaintiff told Dr. Trippe that he was able to cook, clean, shop, drive, volunteer, take two 45-minute walks per day, talk on the phone with friends, go out to eat occasionally, and manage money. (Tr. at 29.)

Second, the ALJ found mild limitation in social functioning. (Tr. at 29.) Plaintiff reported isolating himself for a nine-month period in 2011, but since then he had been able to engage in activities demanding some degree of social interaction, including shopping, talking with friends, and attending church services. (Tr. at 29-30.) The consultative examiners described plaintiff as pleasant, suggesting a capacity for positive and appropriate social interaction. (Tr. at 30.)

Third, the ALJ found mild limitation in concentration, persistence, and pace. Plaintiff alleged difficulty with his ability to remember, complete tasks, concentrate, understand, follow instructions, and handle stress and change. Since October 1, 2011, however, plaintiff had been able to engage in activities demanding some degree of concentration, persistence, and pace, including shopping, driving, and preparing meals. In addition, his mental functioning on exam was good with intact memory and concentration. (Tr. at 30.)

Fourth, the ALJ found that plaintiff had experienced no episodes of decompensation of extended duration. Plaintiff had not required hospitalization or similarly structured treatment for his mental health condition. (Tr. at 30.)[13]

---

[13]Under the regulations, if the ALJ rates the degree of limitation as no more than mild in the first three areas and finds no episodes of decompensation of extended duration in the fourth area, the mental impairment is deemed non-severe. (Tr. at 30, citing 20 C.F.R. 404.1520a(d)(1).)

Case 2:15-cv-00510-LA   Filed 03/15/16   Page 25 of 39   Document 34

In sum, the ALJ found that the medical records failed to substantiate plaintiff's allegations of severe impairments. The consultative examinations showed good mental, social, and physical function; plaintiff acknowledged benefit from medical and alternative interventions; and these good examinations and benefits from treatment were reflected in plaintiff's activities. (Tr. at 30.)

The ALJ further found that plaintiff's activities belied his claims that he lacked the abilities and aptitudes necessary to do most jobs. While plaintiff alleged that from December 31, 2010, to October 1, 2011, he could not leave home, this period lasted less than 12 months. Subsequently, he had been able to engage in a good variety of activities, including performing his own personal care, preparing simple meals, doing household chores, driving, shopping, managing money, watching television, and attending church services. In March 2012, plaintiff told Dr. Trippe that he was able to cook, clean, shop, drive, volunteer, take two 45-minute walks per day, talk on the phone with friends, go out to eat occasionally, and manage money. (Tr. at 30.)

As for the opinion evidence, the ALJ gave significant weight to the reports from the agency medical consultants, Drs. Khorshidi and Foster, who found no severe physical impairment. The ALJ found their assessments consistent with the good examinations showing no deficits in plaintiff's ability to walk, perform transfers, tandem walk, squat, or hop. (Tr. at 30.) Their opinions were also supported by plaintiff's activities during the relevant period, including taking long walks on a frequent basis and doing some chores and shopping. (Tr. at 30-31.)

The ALJ gave some weight to Dr. Trippe's opinions. Dr. Trippe found mild limitations in plaintiff's ability to understand, remember and carry out simple instructions, adapt to changes, concentrate and focus, take directions from authority figures, and work with peers.

26

The ALJ found this portion of Dr. Trippe's assessment consistent with plaintiff's performance on exam, where he displayed intact memory, concentration, fund of knowledge, thought content, and thought processes without signs of depression or anxiety. This portion of the assessment was also consistent with plaintiff's activities, including volunteering in church, attending church, and preparing meals. (Tr. at 31.) On the other hand, Dr. Trippe assigned a GAF of 58-63, indicating mild to moderate impairment in psychological and emotional functioning, and opined that plaintiff would have moderate limitations in his ability to maintain a regular schedule of activities and tolerate stress at work. The ALJ found this inconsistent with Dr. Trippe's own observations that plaintiff exhibited no signs of depression or anxiety and plaintiff's very good performance on examination tasks. Further, it was not supported by plaintiff's ability to volunteer at church, maintain his schedule of appointments with alternative medical care providers, and exercise on a regular basis. (Tr. at 31.)

The ALJ gave great weight to the opinion of the medical expert who testified at the hearing, Dr. Larrabee, who found mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace. Dr. Larrabee refuted Dr. Trippe's opinion that plaintiff had moderate limitations in his abilities to maintain a regular schedule of activities and tolerate stress at work. Dr. Larrabee had the opportunity to review the medical record and listen to plaintiff's testimony. His assessment was consistent with Dr. Trippe's evaluation report showing no abnormalities in plaintiff's memory, attention, fund of knowledge, thought processes, and thought content. It was also supported by plaintiff's good range of activities. Finally, it was consistent with the absence of significant, ongoing mental health care with a mental health care professional. (Tr. at 31.)

The ALJ gave limited weight to the opinions of the state agency psychological

consultants, Drs. Edelman and Pape, who found a severe mental impairment with mild limitations in activities of daily living and social functioning, but moderate limitations in concentration, persistence, and pace. The ALJ found their findings on the first two areas consistent with Dr. Trippe's exam report documenting a good range of activities. (Tr. at 31.) These findings were also compatible with plaintiff's social function on examination, as he was described as pleasant and cooperative, and with Dr. Larrabee's testimony. (Tr. at 31-32.) However, the ALJ disagreed with the moderate limitation in the third area, as it was inconsistent with Dr. Trippe's report showing that plaintiff's memory, attention, and concentration were intact, as well as Dr. Johnson's description of plaintiff. Moreover, plaintiff was able to engage in activities requiring some degree of concentration, persistence, and pace, including volunteering, shopping, and exercising. (Tr. at 32.)

In sum, the ALJ found that plaintiff's mental and physical impairments, considered singly and in combination, did not significantly limit plaintiff's ability to perform basic work activities. The ALJ found this conclusion supported by the opinions of Drs. Trippe, Khorshidi, Foster, and Larrabee, as well as the overall record. Because plaintiff did not have a severe impairment or combination of impairments, the ALJ found him not disabled. (Tr. at 32.)

Plaintiff sought review by the Appeals Council (Tr. at 20), but on November 12, 2014, the Council denied review (Tr. at 7). This action followed.

## II. DISCUSSION

### A.    Disability Standard

A claimant qualifies as disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The agency has established a sequential evaluation process for disability claims under which the claimant must make a "threshold showing" that he suffers from a severe, medically determinable impairment.[14]  See Bowen v. Yuckert, 482 U.S. 137, 149-50 (1987).  A physical or mental impairment must be established by medical evidence, not only by the claimant's statement of symptoms.  20 C.F.R. § 404.1508.  Statements of symptoms are evaluated to the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 404.1529(a).

An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  Basic work activities mean the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

While the ALJ should continue with the sequential evaluation process if he is unable to clearly determine the effect of an impairment or combination of impairments, the "severity

--------------------

[14]If the claimant makes this showing, the ALJ determines whether the claimant's impairment qualifies as conclusively disabling under the agency's Listings; if not, whether the impairment prevents the claimant from performing his past work; and, if so, whether the impairment prevents the claimant from performing other work in the national economy.  See, e.g., Curvin v. Colvin, 778 F.3d 645, 647 (7th Cir. 2015).  Because the ALJ found that plaintiff failed to establish a severe impairment, he did not proceed with the remaining steps of the sequential evaluation process in this case.

29

requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs." SSR 85-28. The burden at step two has been described as de minimis, but it is nevertheless one the claimant must meet. See, e.g., Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010).

## B.   Plaintiff's Arguments

The ALJ found that while plaintiff had medically determinable impairments, they did not significantly limit his ability to work. Plaintiff argues that (1) the ALJ failed to consider the entire treatment record in determining whether his impairments, singly or in combination, met the severity requirement; (2) the ALJ improperly evaluated the medical opinions; and (3) the ALJ erred in considering the four broad functional areas for mental disorders. I address each argument in turn.

### 1.   Consideration of Entire Treatment Record

As plaintiff concedes, the ALJ cited a significant amount of medical evidence, including treatment notes, x-rays, and findings from the consultative examination, in support of his conclusion regarding plaintiff's physical condition. However, plaintiff faults the ALJ for failing to discuss certain other evidence from his acupuncturist and chiropractor. (Pl.'s Br. at 18-19.)

The ALJ need not discuss every piece of evidence in the record and is "prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). Plaintiff makes no such showing, citing a few stray notes that do not, in any event, undermine the ALJ's decision. On April 15, 2011, plaintiff told the acupuncturist that he had backed off walking for exercise because of pain in his groin (Tr. at 371), but by September 6, 2011, the acupuncturist reported that plaintiff was walking normally

30

(Tr. at 381) – as the ALJ noted (Tr. at 28). On June 17, 2011, plaintiff reported continued right sciatica and head tension (Tr. at 377), and on November 22, 2011, he reported continued right foot tension (Tr. at 384), but plaintiff fails to explain how either of these notations by the acupuncturist support a finding of a severe impairment. In February 2011, plaintiff's chiropractor noted a marked left pelvic rotation, a ½ inch left leg deficiency, and neurofibroma disease (Tr. at 351), but plaintiff again fails to explain how these observations undermine the ALJ's conclusion based on the specific findings of the medical consultants that plaintiff had no significant physical limitations.

Plaintiff takes issue with the ALJ's statement that he was not fully compliant with physical therapy (Tr. at 28), noting that he canceled some of his sessions because of illness and the long distance he had to travel to therapy (Tr. at 323, 326) and faulting the ALJ for not inquiring why he failed to follow this prescribed treatment. See SSR 82-59 ("A full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable."). As the ALJ correctly noted, however, the therapist discontinued treatment due to cancellations and because plaintiff continued to follow his own self-prescribed management program rather than that of the physical therapist. (Tr. at 28, 336.) Plaintiff provides no explanation for his failure to follow the program when he did attend his sessions. In any event, this therapy took place in August and September 2010, prior to the alleged onset date of December 31, 2010, so it is hard to see how the ALJ's failure to say more about it requires remand.[15] The same is true of the 2009-2010 notes from Drs. Anderson and

_____

[15]Plaintiff notes that Dr. O'Connor, who made the referral, never indicated that this therapy would restore ability to work. However, plaintiff cites no evidence that Dr. O'Connor, who treated plaintiff in the summer of 2010, six months before the alleged disability onset date, ever took plaintiff off work in the first place.

31

O'Connor, which plaintiff also cites (Pl.'s Br. at 19-20); the ALJ acknowledged the conditions set forth in those notes and the treatment plaintiff received (Tr. at 28), and plaintiff points to nothing in the notes supporting limitations on his ability to work. See Schmidt v. Barnhart, 395 F.3d 737, 745-46 (7th Cir. 2005) (noting that a mere diagnosis does not necessarily mean the claimant suffers from severe associated symptoms); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [a medical condition], of course, says nothing about the severity of the condition."); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").[16]

Regarding plaintiff's mental condition, the ALJ discussed plaintiff's reported symptoms, the treatment he received, and the indications of improvement in the records, as plaintiff also concedes. Plaintiff notes that a favorable response to treatment does not necessarily mean the person can work full-time. See Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). Scott stands for the proposition that an ALJ should not reject a treating source's opinion supporting disability just because the source's notes reflect improvement with treatment. Id. at 739-40. Plaintiff provided no such opinion in this case.

Plaintiff cites notes from the acupuncturist and one of his massage therapists documenting continued tension and episodic stress and nervousness. (Pl.'s Br. at 21.) As

_____

[16]Plaintiff also cites notes from the spring of 2011 recording continued trouble urinating. (Pl.'s Br. at 20.) As plaintiff concedes, however, by September 6, 2011, he told the acupuncturist that he continued to void on his own. (Tr. at 382.) The ALJ acknowledged that plaintiff may have experienced more severe symptoms from December 31, 2010, to October 1, 2011, a period of less than 12-months, but thereafter his condition improved. (Tr. at 30.)

32

indicated, however, the ALJ is not required to discuss every piece of evidence in the record, and plaintiff fails to explain how these notes undermine the ALJ's conclusion. Finally, plaintiff states that while Dr. Willett in his September 4, 2013, note indicated that plaintiff's anxiety had improved, Dr. Willett did not release plaintiff to return to work. (Tr. at 550.) But plaintiff cites no evidence that Dr. Willett ever took plaintiff off work in the first place.

In sum, plaintiff fails to demonstrate that the ALJ overlooked significant evidence of disability or otherwise failed to reach a decision based on a fair reading of the entire record. The ALJ also properly considered the combined effects of plaintiff's impairments.

**2. Opinion Evidence**

Plaintiff contends that the ALJ cherry-picked from the medical opinion evidence, relying on the opinions of Drs. Khorshidi and Foster, who found no severe physical impairments, while overlooking the records from his urologists, Drs. Anderson and O'Connor, and his primary physician, Dr. Willett, as well as records from his acupuncturists, massage therapists, and physical therapist documenting chronic and acute urinary dysfunction. The ALJ discussed plaintiff's urinary problems and the treatment he received therefor (Tr. at 28), and plaintiff points to nothing in the cited notes supporting a finding that those problems significantly limited his ability to do basic work activities. See Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010) ("The burden. . . is on the claimant to prove that the impairment is severe.").

In his reply brief, plaintiff challenges the ALJ's reliance on Dr. Johnson's report, arguing that Dr. Johnson did not assess plaintiff's urinary problems. (Pl.'s Rep. Br. at 3.) That is incorrect; Dr. Johnson specifically noted plaintiff's history of urinary problems. (Tr. at 417.) Plaintiff points to no medical evidence that his urinary dysfunction significantly limited his ability to work. He cites his own statements to the doctor and at the hearing, but the ALJ found

33

plaintiff's claims regarding the severity of his symptoms not fully credible, a finding plaintiff does not challenge.

Plaintiff further argues in reply that the ALJ failed to discuss corroborating evidence of urinary dysfunction from his alternative treatment providers. See SSR 06-03p (noting that while only acceptable medical sources can give medical opinions and establish the existence of a medically determinable impairment, the agency will consider evidence from other sources (e.g., therapists) on issues such as impairment severity and functional effects). But the ALJ did consider this evidence. (Tr. at 28.) That he did not discuss every specific note plaintiff references in his reply brief does not require remand.[17] Moreover, plaintiff fails to explain how any of the cited notes support a finding that urinary dysfunction significantly limited his ability to do basic work activities.

Plaintiff also faults the ALJ for rejecting those portions of the opinions of the mental consultants, Drs. Trippe, Edelman, and Pape, finding moderate limitations. Plaintiff argues that the ALJ "played doctor" by interpreting Dr. Trippe's exam findings as inconsistent with moderate limitations. See Moon v. Colvin, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."). The ALJ gave several reasons for rejecting these limitations, including the contrary opinion of the testifying medical expert, Dr. Larrabee. Rather than playing doctor, the ALJ did what he was supposed to do – he weighed the conflicting opinions and decided

---

[17]In reply, plaintiff notes the intrusive treatment provided by Dr. O'Connor. (Pl.'s Rep. Br. at 6.) The ALJ discussed this treatment, which improved plaintiff's condition. (Tr. at 28.)

which one to credit.  See Young v. Barnhart, 362 F.3d 995, 1001-02 (7th Cir. 2004).[18]

Plaintiff also criticizes the ALJ for failing to discuss certain moderate limitations in Dr. Edelman's mental residual functional capacity ("RFC") assessment.  However, the ALJ did discuss – and reject – Dr. Edelman's finding of a moderate limitation in the broad area of concentration, persistence, and pace.  (Tr. at 31-32.)  Having done that, he was not required to say more regarding the related aspects of mental RFC.  See 20 C.F.R. § 404.1520a(d)(3) (noting that if the claimant's mental impairment is severe but does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC).

Plaintiff further argues that the ALJ failed to discuss Dr. Johnson's finding of a severe anxiety disorder, which might be affecting his physical symptoms.  (Tr. at 417.)  The ALJ discussed plaintiff's anxiety, as well as Dr. Johnson's assessment of plaintiff's physical abilities, the purpose of Dr. Johnson's exam.

Finally, plaintiff faults the ALJ for crediting Dr. Larrabee's opinion, noting that Dr. Larrabee never treated or examined plaintiff.  While the opinion of a source who examined the claimant is generally worth more than the opinion of a source who did not, the ultimate weight given to any opinion will depend on the opinion's consistency with the objective medical evidence, the quality of the explanation, and the source's specialty.  Givens v. Colvin, 551 Fed. Appx. 855, 860 (7th Cir. 2013).  Here, the ALJ reasonably found the assessment from Dr. Larrabee, a clinical psychologist, most consistent with the record as a whole.  (Tr. at 31.)

_____

[18]In his reply brief, plaintiff argues that the ALJ failed to state what weight he accorded the different portions of Dr. Trippe's opinion.  (Pl.'s Rep. Br. at 7.)  That is incorrect.  The ALJ explained that he gave "some weight" to Dr. Trippe's opinion, crediting the mild limitation findings but rejecting the moderate findings.  (Tr. at 31.)  The ALJ acknowledged that Dr. Trippe examined plaintiff in person.  As discussed in the following text, there is no requirement that the ALJ always favor examining over non-examining sources.

35

Plaintiff questions what medical records Dr. Larrabee reviewed, noting that Dr. Larrabee referenced only Dr. Trippe's report and plaintiff's function report in opining on the functional areas. (Tr. at 110.) Dr. Larrabee testified that he reviewed the record; as the ALJ noted at the hearing, "We in fact updated the record for the missing information you were kind enough to tell us was not present to confirm we had a total record. We got that information to you." (Tr. at 108.) Dr. Larrabee further confirmed that he had reviewed the reports from the massage therapist and acupuncturist. (Tr. at 112.) Plaintiff argues that Dr. Larrabee incorrectly stated that those reports made no reference to plaintiff needing psychiatric treatment. (Tr. at 112.) Dr. Larrabee was correct; while plaintiff cites certain records from the acupuncturist and massage therapist noting stress, OCD behavior, and anxiety (Pl.'s Br. at 25), these providers did not refer plaintiff for psychiatric treatment, as plaintiff himself conceded at the hearing. (Tr. at 92.) Plaintiff notes that physical therapist Magnuson said he might need professional counseling on stress management if he returned to work, but that was in September 2010 (Tr. at 328), before the alleged onset date. In any event, plaintiff's counsel had the opportunity to question Dr. Larrabee at the hearing regarding the bases for his opinion. He could have brought these records to the doctor's attention; he did not.

When examining and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as he adequately explains and substantial evidence supports his decision. See Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001). The present decision meets these standards.

### 3.     Four Broad Functional Areas

Finally, plaintiff argues that the ALJ erred in finding mild limitations in the broad functional areas set out in the mental impairment regulations. However, the ALJ provided a

thorough explanation for these findings. Regarding activities of daily living, the ALJ noted plaintiff's statement that he was essentially bed-ridden between December 31, 2010, and October 1, 2011. However, this period lasted less than 12 months, and plaintiff admitted that after October 1, 2011, he was able to engage in a variety of activities, including preparing simple meals, doing household chores, driving (although he did not like heavy traffic), shopping in stores and by computer, managing money, and attending church services. In March 2012, plaintiff told Dr. Trippe that he was able to cook, clean, shop, drive, volunteer, take two 45-minute walks per day, talk on the phone with friends, go out to eat occasionally, and manage money. (Tr. at 29.) Regarding social functioning, the ALJ noted that since October 2011 plaintiff had been able to engage in activities demanding some degree of social interaction, including shopping, talking with friends, and attending church services. (Tr. at 29-30.) The ALJ further noted that the consultative examiners described plaintiff as pleasant, suggesting a capacity for positive and appropriate social interaction. (Tr. at 30.) Regarding concentration, persistence, and pace, the ALJ noted that since October 2011 plaintiff had been able to engage in activities demanding some degree of focus, including shopping, driving, and preparing meals. In addition, his mental functioning on exam was good with intact memory and concentration. (Tr. at 30.)[19]

Plaintiff argues that the ALJ failed to discuss alleged limitations in his ability to perform

---

[19]The ALJ found no episodes of decompensation, a finding plaintiff did not challenge in his main brief. In reply, he contends that the period of December 31, 2010, to October 1, 2011, during which he reported spending 90% of the time in bed, could be deemed an episode of decompensation. (Pl.'s Rep. Br. at 12-13.) Arguments raised for the first time in reply are waived. See, e.g., Billhartz v. Commissioner, 794 F.3d 794, 801 n.4 (7th Cir. 2015). In any event, while hospitalization or similarly structured treatment is not the only way of showing an episode of decompensation, see Larson v. Astrue, 615 F.3d 744, 750 (7th Cir. 2010), plaintiff fails to cite any medical evidence in support of this argument.

37

certain activities (Pl.'s Br. at 27; Pl.'s Rep. Br. at 10-11, 12); evidence of his limited social life (Pl.'s Br. at 28; Pl.'s Rep. Br. at 11); and notes from his alternative providers documenting obsessive behavior, anxiety, and short attention span (Pl.'s Br. at 29; Pl.'s Rep. Br. at 12).[20] The ALJ accepted that plaintiff was not symptom-free, and he was not required to specifically discuss every symptom or accommodation referenced in the record.[21] See Barnica v. Colvin, Case No. 13-C-1012, 2014 BL 249818, at *7 (E.D. Wis. Sept. 9, 2014) (Griesbach, J.) ("Although Plaintiff accuses the ALJ of cherry-picking positive evidence, she is attempting to do the same on the other end. The purpose of a disability determination is not to determine whether a claimant with mental health problems ever had very bad periods; it is to determine, based on the whole record, whether the claimant would be able to work.").

Plaintiff correctly notes that the ability to perform simple household chores and get together with friends from time to time does not necessarily mean the person can work full-time. See Scrogham v. Colvin, 765 F.3d 685, 700 (7th Cir. 2014); Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004). But the ALJ never said that, and he was, of course, required to discuss plaintiff's activities and social functioning in evaluating these areas of functioning. Because he committed no legal error, he adequately explained his conclusions, and substantial evidence supports those conclusions, the ALJ's decision must be affirmed.

---

[20]Plaintiff also faults the ALJ for failing to discuss his testimony that he was discharged from his job because of his health. (Pl.'s Rep. Br. at 12.) Plaintiff testified that he was let go because of a company wide downsizing and his health. (Tr. at 54-55.) In any event, this was in 2008, two years prior to the alleged onset date. Plaintiff also cites an August 26, 2010, note from his physical therapist that he required repeated redirection. (Pl.'s Br. at 29, citing Tr. at 338.) This was also pre-onset.

[21]Moreover, the ALJ found plaintiff's statements not entirely credible (Tr. at 27), a finding plaintiff has not challenged.

38

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of March, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge